Gentlemen:
Via separate requests to this Office you have asked for our opinion on the legality of a private party gating a portion of the Amite River. Because the requests are virtually identical and because they relate to the same matter, all issues are considered in this one Attorney General`s opinion.
Introduction and Background
The specific facts related to these requests are important to the legal analysis that follows and will therefore be summarized here. During the late 1950s or early 1960s, the Army Corps of Engineers ("the Corps") made several channels along the Amite River to improve the flow of that waterway. The practical effect of creating these channels was to create straight-aways in the River where sharp curves had naturally occurred. As the River was straightened the main flow largely abandoned the natural curves, in many cases resulting in a silting-in of part or all of these bodies of water, sometimes creating oxbow lakes. The portion of the Amite River that is the subject of these requests is precisely one of these straight-aways.
In the instant matter, the Corps cut a straight-away, across the Sutherland property,[1] at a sharp bend in the Amite. The straight-away quickly captured the main flow of the channel and the old bed silted in. This human activity on the Amite River created a strange legal situation. Since the time of the Corps` work, the State Land Office has maintained that, where the Amite River now traverses the Sutherland property, "[t]he state does not claim the bed and water bottom of that portion of the Amite River which has been dredged and widened by artificial means as a historically navigable waterway."[2]
However, the State Land Office also notes that this lack of a claim is based on a "cursory review" of its records and that the above statement expressly excludes "[a]ny matters of historic usage, navigability in law, public rights of use and access or other matters which are beyond the purview of this office."[3] Thus, while this opinion of the State Land Office is informative in that it identifies a significant legal problem regarding the Amite River as it crosses the Sutherland property, it is not legally binding and does not cover the question of whether the River can be gated. These legal issues are addressed fully herein.
Because the new channel is a navigable straight-away, a local ski school has been using that part of the River for its boating activities.[4] According to the Sutherlands, the excess boat traffic is causing substantial erosion to his riparian property.[5] The Sutherlands are also concerned about liability issues of the skiers traversing this stretch of the river. The liability concerns of the Sutherlands are compounded if the State Land Office opinion is correct in stating that the water bottoms of the Amite River along the Sutherland property are not State-owned. This could open the Sutherlands up to substantial liability if someone is injured along that stretch of the River. Thus, two major questions regarding the ownership of the water bottoms and the rights to the flow of the River must be addressed:
 1) Who does own, from a strictly legal perspective, the water bottoms of the Amite River as it traverses the Sutherland property?
 2) Can a private party place a gate across a waterway in the State of Louisiana to block vessel traffic?
What follows is an examination of these two questions as well as suggestions for remedying some of the practical problems that may flow from the conclusions of this analysis.
Ownership of the Amite River Water Bottoms Along the SutherlandTract
As a general matter, the Louisiana Civil Code holds that "[p]ublic things that belong to the state are such as running waters, the waters and bottoms of natural navigable water bodies, the territorial sea, and the seashore."[6] Thus any analysis of the ownership of a water bottom must begin with the general premise that the State is the owner of the beds of all navigable water bodies within its borders. The Amite River is unquestionably a navigable waterway of the State in the area of the Sutherland property.[7] Thus, in a typical situation, the State would be the owner of the bottom of the Amite River as it traverses the Sutherland property. However, the Amite River has not always traversed this property. In 1956, the Corps, in an effort to facilitate the more efficient drainage of the Amite River, cut the current channel across the Sutherland tract. In so doing, the bottom of the newly created channel remained the private property of the Sutherland family, while the now-silted-in original Amite channel remained the public property of the State of Louisiana.
Because we are dealing with essentially private property in this matter, it would not seem unreasonable, under the general rules of trespass, for the Sutherlands to be able to limit or restrict access to their property. However, the one complicating fact in this scenario is that the private channel has flowing through it "running waters," which, under La. C.C. 450 are public things belonging to the State. It is clear and it is the opinion of this Office that it is impermissible to capture or stop the flow of the running waters of this State, even if they traverse private property.
Ownership of Water and Restriction of Access
The above opinion does not completely resolve the issue presented. The Sutherlands want to erect a floating gate across the Amite where it traverses their property. Arguably, this floating gate would not capture or restrict the flow of the running waters of the State, but it would effectively restrict any public use of this portion of the Amite River. So, can it be done under the law? It is our opinion that the short answer to this question, explained in detail below, is no.
As a general premise, Yiannopoulos states that "[a]ccording to Article450 of the Louisiana Civil Code, running water is a public thing. As such, it is owned by the state in its capacity as a public person and it is subject to public use."[8] Thus, it is axiomatic that the general public has a right to access running water in the State of Louisiana. However, several cases have narrowed this broad generalization. While these cases are informative to the present inquiry, they are factually distinguishable and should not be controlling with regard to the Amite River matter.
The most important of these cases is Buckskin Hunting Club v.Bayard.[9] In this case, the Third Circuit held that certain pipeline canals in the Atchafalaya Basin were not susceptible of the public use tenet provided for in the Civil Code.[10] This is not a surprising result, as it is also well settled that private canals constructed with private funds, even if navigable, are not de facto subject to a public use.[11] However, the fact that the channel in this matter and the canals in the Buckskin case were man-made is where the similarities between these two cease. The Buckskin canals were made for the purposes of supporting hydrocarbon transport through pipelines. The channel in the current matter was constructed to facilitate the flow in a river of this State. Unlike in Buckskin, where the canals were dug on private land[12] with private funds, the channel herein was dug on private land with public funds to support the public purpose of better drainage of the Amite River. The distinction that the channel at issue here is part of a navigable river of the State, whereas the canals ofBuckskin were private pipeline canals in periodically inundated areas of the Atchafalaya Basin is significant. It is the opinion of this Office that the court in Buckskin did not contemplate and did not intend for its ruling to extend to exclusions of the public from the rivers of the State, but only from areas in which there is strictly a private interest in constructing a canal and that the safety of the people is best served by limiting access to such canals.[13]
Also of interest with respect to this matter is People for OpenWaters, Inc. v. Estate of J.G. Gray.[14] This case dealt with a canal wholly constructed on private land where, as here, the landowner was concerned with problems such as litter and bank erosion, among other things.[15] Although the Third Circuit here also found that the public did not have a de facto right of use to this canal simply because it is navigable-in-fact and because it captures the flow of waters of the State, the facts substantially differ from the current matter. Interestingly, the court in Gray noted that "we find no validity to the assumption that because the water in the canal is a public thing, the public must have a right to use the canal."[16] The court stated that the only thing, in this case, that the landowner was obligated to do was to ensure that the flow of the waterway was not diminished as it traversed his property. However, in quoting Yiannopoulos, the court noted that "[n]either landowners nor members of the general public have the right to cross private lands in order to avail themselves of running water."[17] This statement suggests that the court was contemplating a different use than traversing the waters of the State as they pass over private property. It seems to suggest that the court wanted to make clear that the public had no overland right to access running water on private property. However, it seems illogical to restrict the public from using the public resource via a waterborne route (i.e., coming down the River to the private tract and passing over it in the water).Buckskin actually directly supports this interpretation thus: "Landowners and members of [the] general public have [the] right to use running water for their needs, if they have access to it."[18] It is clear here that the public does have access to the water in the Sutherland channel via the rest of the Amite River and that the tenets implicating overland access to running water do not apply to this scenario.
Additionally, as with Buckskin, the channel in Gray was not a man-made straight-away on a river, but rather a channel constructed for specific commercial purposes. Because it was not part of a river, it is easily distinguishable from the present scenario. But for the construction of the straight-away across the Sutherland property, the public would have no restriction at all in the traversing of this portion of the Amite River. Because the man-made channel completely captures the flow of running waters of the State on a river that, on either side of the subject property is subject to State ownership, it does not seem logical or equitable to restrict the public from access to the Sutherland portion of the river.
Based upon the foregoing review of these cases, it has become apparent that an earlier opinion of this Office was perhaps overly broad when it suggested that no landowner has to permit the public to access running water that traverses their estate. In La. Atty. Gen. Op. No. 04-0082A, we opined that Buckskin essentially overruled any prior law granting the public a right of use to waterways as they traverse private property. Although the opinion cautions that such matters must be decided on a case-by-case basis, the blanket recalling of La. Atty. Gen. Op. Nos. 90-557 and 04-0082 seems contrary to that cautionary note. We also feel it important to note that the Buckskin case was a Third Circuit case and, until the matter is fully decided by the Louisiana Supreme Court, the holding in that case is not binding in any other Louisiana jurisdiction. Opinion 04-0082A cites only a small portion ofBuckskin for its conclusion and it does not address the question of what type of water body is at issue when determining access. Although we do not hereby recall La. Atty. Gen. Op. No. 04-0082A, we do suggest that extreme caution be used in applying such blanket conclusions to water body access in the absence of specific facts.
Based upon the foregoing analysis and resting heavily on La. C.C. Art.450, Yiannopolous, and the canal nature of any conflicting cases, it is our opinion that the law does not support the gating of a river in Louisiana, certainly not under the facts presented here. Such an action is contrary to the concept that the waterways of this State are highways for commerce and recreation. The direct effect of such gating would be to cut off all residents and businesses above the Sutherland property from those below. It is also important in this vein that the channel that traverses the Sutherland property was not constructed as a commercial canal using private funds and completely contained within private property. The channel here is part of a major river within the State. Thus the safety concerns espoused in the Buckskin case are not applicable here. There is no risk of damaging hydrocarbon pipelines, whereas there is a substantial risk of setting a precedent that would provide for the gating of water bodies across the State, regardless of the economic and social impacts of such an activity.
Implications of Attorney General Opinion Numbers 81-873 and93-238
Some twenty-five years ago, this Office opined that,
 the law will now apparently be that the construction of a private canal on private lands which resulted in a diversion of naturally navigable waterways would create a general right of use in the public.[19]
This opinion should apply, a fortiori, to the current matter, as the channel that was cut across the Sutherland property was done with public funds and for a public purpose. This conclusion, which we here support, was based on the United States Supreme Court decision in Vaughn v.Vermilion Corporation[20] and the remand decision in that matter by the Louisiana Third Circuit.[21] These cases remain good law today and we see no reason to question their sound holdings.
As additional support for the conclusion that we have reached,supra, regarding the gating of the Amite River, La. Atty. Gen. Op. No. 81-873, relying on Discon v. Saray, Inc.,[22] is instructive. That opinion discusses the possibility that a public servitude may be acquired over a private canal via acquisitive prescription.
 Finally, the last point which need be discussed in this matter, is whether or not the public could acquire a right to use a private canal constructed on private lands with private funds by the running of time. In the Discon case cited, supra, the Court held:
 `However, Article 703 (Civil Code) is without relevance here, inasmuch as its provisions apply only to servitudes of passage imposed by law in favor of an enclosed estate.`
 If any of the Codal Articles is applicable it would be Article 777 which deals with the change of location of a conventional or voluntary servitude. It provides:
 `The owner of the estate which owns the servitude can do nothing tending to diminish its use, or to make it more convenient.`
 Thus, the Court in this case looked only to the servitude owed to an enclosed estate. The Court did not consider the right of the public to prescribe against a private landowner for use of his private canal.
 Under prior existing laws servitudes of passage and use by the public were considered as discontinuous and apparent servitudes and the old jurisprudence held that a discontinuous servitude could not be acquired by prescription but only through title. However, Article 740 of the Louisiana Civil Code, 1977 Revision, states:
 `Apparent servitudes may be acquired by title, by destination of the owner, or by acquisitive prescription.`
 In addition, Article 742 of the Louisiana Civil Code states as follows:
 `The laws governing acquisitive prescription of immovable property apply to apparent servitudes. An apparent servitude may be acquired by peaceable and uninterrupted possession of the right for ten years in good faith and by just title; it may also be acquired by uninterrupted possession for thirty years without title or good faith.`
 Thus, in effect these two Articles have overruled all the prior jurisprudence concerning discontinuous and apparent servitudes. The law now indicates that the servitude of passage, which is discontinuous and apparent can be acquired through acquisitive prescription.
 The public can acquire by prescription a right of passage on private canals in the following manner:
 (a) possession of the right for ten years in good faith and by just title; [or]
 (b) uninterrupted possession for thirty years without title or good faith.[23]
Although we do not go so far as to conclude that such a servitude has been created across the Sutherland property, as we feel that such an inquiry is better left to the courts to decide, we do believe that this theory is a distinct possibility in this situation; one which would further support our conclusion that the Amite River cannot be gated as it traverses the Sutherland property.
We also feel it necessary to discuss the Fourth Circuit decision inD`Albora v. Garcia.[24] This case, which is still good law, states that,
 it is the susceptibility of use as highways of commerce which gives sanction to the public right of control to the exclusion of private ownership of either the waters or the soils under them.[25]
We find this statement, as did this Office in La. Atty. Gen. Op. No. 81-873, to control with respect to the question of the use of public waterways that pass over private water bottoms for vessel traffic.[26]
Because this is precisely the issue in the present matter, we reaffirm our opinion that the Sutherlands, under the reasoning discussed inD`Albora, cannot gate the Amite River.
In 1994, this Office, once again, revisited the question of the public`s ability to use private canals. In La. Atty. Gen. Op. No. 93-238, we noted, citing the Brown v. Rougon case,[27] that when public finds are used to construct a canal across private property, the public`s use of that canal is limited by the specific contractual grant of use between the private landowner and the public entity constructing the canal. We do not here dispute this conclusion. However, the canal at issue in that opinion as well as in Brown was not a segment of a navigable river of the State. We do not think that the same limiting principle applies to canals that become the main channels of navigable rivers of the State as to canals that are merely offshoots of other water bodies.[28]
We are also in agreement with La. Atty. Gen. Op. No. 93-238 with respect to the matter of the classification of anthropogenically created canals. Citing Amigo Enterprises v. Gonzales,[29] that opinion noted that "the Court stated that a canal that was man-made would not be a public thing under the provisions of Civil Code 450."[30] There is little doubt that this statement is correct. The canal would remain the private property of the underlying landowner, but in some circumstances, such as the instant matter regarding the Sutherland property, the water flowing through such canals is subject to a public use.
Applicability of Civil Code Article 504
Some attention has been paid during this analysis to the implications of La. C.C. Art. 504. Civil Code Article 504 sets forth the law concerning the ownership of the bed of a navigable river or stream when the waters change their course. The article states, in pertinent part, that,
 When a navigable river or stream abandons its bed and opens a new one, the owners of the land on which the new bed is located shall take by way of indemnification the abandoned bed, each in proportion to the quantity of land that he lost.
La. C.C. Art. 504. It is the opinion of this Office that Article 504 is inapplicable to the current scenario. This article contemplates natural deviations of a waterway from its original bed. Such is not the situation in the current request. The channel that crosses the Sutherland property was anthropogenically constructed; it was never the result of any natural activity. It is settled law that the water bottoms of artificial, navigable channels remain the private property of the original title owners of the underlying property. La. C.C. Art. 450, cmt. (f). Thus it is our opinion that when the Corps dredged the new Amite River channel across the Sutherland property that the Sutherlands did not, by operation of law, become the default owners of the old bed and the State the current bed. The State continues to own the abandoned bed of the Amite River as is abuts the Sutherland property; La. C.C. Art. 504 is inapplicable; and the Sutherlands own the water bottom of the Amite River where it crosses their property.
Possible Alternatives
The foregoing considered and although we cannot conclude that Mr. Sutherland can legally gate the waters of the Amite River, this Office is not wholly without sympathy for the plight of the Sutherlands. It is no small thing to endure to have your property bisected by a river and to then be forced to live next to sometimes obnoxious uses along your property.[31] For that reason, we offer the following suggestions that should help to alleviate some of the problems identified by the Sutherlands.
With respect to the erosion now occurring on the Sutherland riparian property, we believe that fairness and equity require either the Corps or the Ascension Parish Government to erect a bulkhead along the original dredge-line of the new channel and to assist in the reclamation of the land that has since been lost due to erosion. While we realize that this charge does not and cannot have any legal effect, it seems the proper thing to do. The failure to do so may open these parties up to liability under the Fifth Amendment to the United States Constitution and Article I, Section 4 of the Louisiana Constitution for the taking of private property without just compensation.[32]
Another possible option to stem the erosion of the Sutherland tract is for Ascension Parish to post and enforce speed limits or "no wake zones" along the Amite River for the tract in question. The Parish has the authority to so regulate pursuant to La. R.S. 34:851.27(B). Because this option would require the expenditure of local resources for essentially perpetual enforcement purposes, the former suggestion, in which the Corps or the Parish erects a bulkhead (a one-time expense), is favored.
As to the nuisance matter, the Sutherlands should consider posting no trespassing signs on their property. They may also consider pursuing actions of trespass against those who violate their rights to peaceable possession of their terrestrial property.
It should also be noted that a public use is afforded on certain private riparian land under La. C.C. Art. 456.[33] However, this public use is contemplated to be for "purposes that are `incidental` to the navigable character of the stream and its enjoyment as an avenue of commerce." Id. at cmt. (b). It would be doubtful that the complained-of drinking and partying that allegedly occurs on the Sutherlands` riparian property qualifies as a reasonable public use under La. C.C. Art. 456.
Finally, we urge the Sutherlands and the above-noted ski school to attempt negotiations regarding liability. As easily as the school likely has its students sign hold harmless agreements for injuries, it could, with equal ease, present them with hold harmless agreements for injuries occurring on the Sutherland stretch of the Amite River.
We hope this sufficiently answers your inquiry, however if we may be of further assistance please do not hesitate to contact our office.
 Sincerely yours,
 CHARLES C. FOTI, JR. ATTORNEY GENERAL
 By: ____________________ RYAN M. SEIDEMANN Assistant Attorney General
 CCF, Jr./RMS/tp
[1] The property was then-owned by William E. McGowan. The Sutherlands are his ancestor-in-title. See Right-of-Way Grant, Ascension Parish, #61857 (Apr. 9, 1960).
[2] Letter from John P. Evans, Jr., Chief, Titles, Surveys GIS, State Land Office, Division of Administration to Curtis Sutherland, February 13, 2006 (on file with the Louisiana Department of Justice).
[3] Id. 
[4] Andy Crawford, Galvez Man Applies for Permit to Block AmiteRiver, 26(10) LOUISIANA SPORTSMAN 30 (2006).
[5] Id. In a letter to this Office, Mr. Sutherland notes that the channel across his family`s property has widened from the original 150 feet to 350 feet. Letter from Curtis Sutherland to Ryan M. Seidemann, Assistant Attorney General, Louisiana Department of Justice, Oct. 22, 2006 at 2 (on file with the Louisiana Department of Justice).
[6] La. C.C. Art. 450.
[7] However, certain upriver portions of the Amite have been judicially declared to be non-navigable. See Chaney v. State MineralBoard, 444 So.2d 105 (La. 1983). That being said, it is clear that the area near Mr. Sutherland`s property is navigable and is supporting at least some vessel traffic for economic purposes (e.g., the ski school).
[8] A.N. Yiannopoulos, 2 LA. CIV. L. TREATISE, PROPERTY § 57 (4th ed.) (footnotes omitted).
[9] 868 So.2d 266, 2003-1428 (La.App. 3 Cir. 3/3/04).
[10] Id. at 275.
[11] Id. at 274-275.
[12] It should be pointed out that at one point in theBuckskin case, there were some State owned lands at issue as well as some contested lands. However, those lands were not the subjects of the holding in the case. Only the private lands were the subjects of the holding.
[13] This interpretation is in keeping with the court`s recognition that the landowners in Buckskin had entered into agreements with the pipeline companies to limit access for safety reasons.
[14] 643 So.2d 415, 94-301 (La.App. 3 Cir. 10/5/94).
[15] Id. at 416.
[16] Id. at 418.
[17] Id. at 418 (citing Yiannopoulas, supra, § 67).
[18] Buckskin, supra, at 274.
[19] La. Atty. Gen. Op. No. 81-873.
[20] 100 S.Ct. 399 (1979).
[21] Vaughn v. Vermilion Corp., 387 So.2d 698 (La.App. 3 Cir. 1980) (on reh`g).
[22] 265 So.2d 765 (La. 1972).
[23] La. Atty. Gen. Op. No. 81-873. The Civil Code articles referred to in that opinion were moved during the 1977 revisions. Article 703 is now La. C.C. Art. 695 and Article 777 is now La. C.C. Art. 748. Civil Code Art. 742 is correctly referenced in the opinion and does not refer to a pre-revision article.
[24] 144 So.2d 911 (La.App. 4 Cir. 1962).
[25] Id. at 914.
[26] See also La. Atty. Gen. Op. No. 84-257. See La. Atty. Gen. Op. No. 81-785 for similar discussions of Discon and D`Albora. 
[27] 552 So.2d 1052 (La.App. 1 Cir. 1989).
[28] See e.g., State v. Two O`Clock Bayou Land Co., Inc.,365 So.2d 1174 (La.App. 3 Cir. 1979) for a similar discussion of one court`s refusal to allow a waterway to be gated when it was navigable-in-fact.
[29] 581 So.2d 1082 (La.App. Cir. 4 1991).
[30] La. Atty. Gen. Op. No. 93-238.
[31] The obnoxious uses, noted by the Sutherlands, appear to stem from patrons of the ski school. "We have become subjected to obscene and illegal behavior such as littering of beer cans, indecent exposure, playing loud music, trespassing on our private dock and the rapid deterioration of the canal banks due to excessive cigarette boat, water ski training and wakeboarding traffic." Sutherland, supra at 3.
[32] The taking herein being the land lost (or inaccessible) due to erosion. State entities have had to pay for similar takings in the past and should be on guard for future such problems. See e.g., Taylor v.State, 03-0219, (La.App. 3 Cir. 6/23/04); 879 So.2d 307, writdenied, 04-1887 (La. 10/29/04); 885 So.2d 595. As has been noted by the Sutherlands, "Ascension Parish has a flood and drainage control project that will allow its tax paying residents to get on a list for broken concrete to control erosion in drainage canals and ditches." Sutherland,supra at 6. It seems to this Office that the Sutherlands should be ideal candidates for such a program, and we recommend that the Parish work with the Sutherlands towards this end.
[33] Louisiana Civil Code Article 456 defines "banks" of navigable waterways thus: "the land lying between the ordinary low and the ordinary high stage of the water."
 October 22, 2006
Curtis Sutherland, 18356 Ravenwood Lane, Galvez, LA 70769, Work Phone: 225-339-2125, Cell Phone: 225-715-7172, e-mail: cwsutherland@eatel.net
Mr. Ryan Seidemann, Louisiana Department of Justice, 1885 North Third Street — Sixth Floor, Baton Rouge, LA 70802
Dear Mr. Seidemann,
Please accept the following clarifications in response to the August 10, 2006 Resolution of the Ascension Parish Waterways Commission (APWC) regarding our permit to gate our property.
First and foremost, I would like to clear up an apparent misperception of the APWC and others who are interested in our permit application. The water running across our property is not the Amite River. It is a canal dredged by the Corps of Engineers in the 1950s for drainage purposes pursuant to a servitude agreement between the Corps of Engineers and the prior owner of the property and our author-in-title. The Corps of Engineers and Ascension Parish entered into a separate agreement for the maintenance of the drainage canal. The Amite River bed, as it existed prior to the drainage project in 1956, remains in place though it is no longer navigable. The water running across our property connects two parts of the Amite River but the ownership of the land where the canal now runs remains with us. The State of Louisiana and the Corp of Engineers both acknowledged our ownership of the drainage canal running across our property.
I respond to each part of the APWC resolution as follows:
THE FIRST WHEREAS
The APWC, though official sounding, is nothing more than a group of volunteer private citizens who have taken it upon themselves to offer unsolicited advice regarding our permit request The APWC has no official responsibility or jurisdiction with respect to our permit request. The APWC charter is strictly limited to "state" waters within or adjacent to the parish. It has no directive or authority with regard to private property which the canal is.
One of the most outspoken and politically connected APWC members owns and operates a commercial boat launch, dry boat storage, and disabled boat towing service on the river. He is soliciting ski school activity business in the area near our property and cares not that the ski school is damaging the river, only that he enjoys the income from their business. This would seem to be a clear conflict of interest.
THE SECOND WHEREAS
Our permit request does not pertain to the "Amite River Channel," it pertains to a man-made canal that was constructed across our privately-owned property under specific terms of a servitude agreement which is recorded in the Ascension Parish public records.
THE THIRD WHEREAS
Again, the APWC refers to the "Amite River" as if this is the issue — it is not. The permit request involves a man-made canal across private property built under recorded terms and conditions that specifically state its location, confines, and intended purpose. The canal was originally constructed with a width of 150 feet. It is now 350 feet and continues to widen outside the servitude boundary at an exponential rate with the increased traffic and un-granted usage of our canal.
A floating "wisperwave" gate (see photo) will in no way impede the flow of water or affect the upstream Amite River water stage. In fact, the permit application specifically provides that the gate will be move and moored to the south bank at or before flood stage waters are reached when the river is closed to boating traffic.
THE FOURTH WHEREAS
As the APWC acknowledges, the State of Louisiana has advised that the land in question (the canal across our property) is subject to private ownership and is not state land (as naturally occurring navigable waterways usually are). Their statement of "is currently being CLAIMED as private property of an adjacent landowner" is diversionary and intended to mislead as is also the term "adjacent landowner." The ownership is not a CLAIM. It is a fact acknowledged and conceded by the state land office. And we are not just adjacent; our ownership of the drainage canal includes the canal bottom and the property on the both sides of the canal.
THE FIFTH WHEREAS
Again, the Amite River is not being blocked; it will continue to exist both above and below the drainage canal. The servitude for the canal across our property is for drainage only. There is no servitude for public use and no dedication. The APWC, many of whose members have a commercial interest in maintaining the status quo, fails to address the significant property damage and disturbance we have experienced as a result of the public use of the drainage canal across our property. If Ascension Parish wanted to maintain the Amite River bed, it should have prevented it from silting in. If Ascension Parish wanted the public to continue to use the drainage canal, it could have heeded our repeated requests to help us by creating and enforcing a "no wake" zone and reinforcing the canal bank. Instead, the APWC wants free use of the drainage canal over our property but at our cost. We are not participating in any of the "commercial value" cited by the APWC but we are suffering diminution of our property value and our land. The statement "will cause damage to the "commercial value" is revealing their conflict of interest and illustrates that they are not concerned with the preservation of the scenic waterway and do not care what damage the ski-school or off-shore cigarette boats are inflicting on the confined banks of the entire river basin.
THE SIXTH WHEREAS
Again, a misleading characterization of the owner`s "claiming" river bottom. It is not the river bottom; it is a man-made canal, and it is not a CLAIM. The acceptance of the application by the Corp of Engineers is an acknowledgement that this is private land. The gating of Private canals is commonplace within Louisiana. The owner of the property on which the private canal is dredged is the owner of the canal. The fact that the private canal on our property is used by so many people, without permission I might add, does not change its characterization as a private canal. We are not claiming the water; it will be allowed to pass across our property unabated.
THE SEVENTH WHEREAS
The APWC opposes our permit application because it is going to negatively impact business on the Amite River. The Amite River will be unchanged. The only difference is that the public will not be able to transverse across our private property. Private business should not be profiting from our property and we should not suffer the cost of public and private use. The private use of our property by the private businesses on the Amite River (i.e., ski schools and boat launches) has resulted in extreme bank destabilization, erosion resulting in river bed siltation and elevated flood stage levels.
THE EIGHTH WHEREAS
Statements and pleads for federal, state, and local government intervention to over-rule and disregard well established Louisiana Law that take away a private property owner`s rights, and give them to private business because it is beneficial to their businesses is unlawful. Ascension Parish is not enforcing current established state laws across our private canal property. We a have become subjected to obscene and illegal behavior such as littering of beer cans, indecent exposure, playing loud and vulgar music, trespassing on our private dock and the rapid deterioration of the canal banks due to excessive cigarette boat, water ski training and wakeboarding traffic. The estimated cost to repair and reclaim our property under a current existing reclamation permit from the Corp of Engineers is from $5 million to $6 million. The damage being caused by the ballasted wake board boats that intentionally throw huge wakes are washing away the banks of our man-made canal property and are doing extreme damage to the entire river and eco-system as well. Consider the cost of the other 40 miles of this river where damage is occurring for state taxpayers to incur. The washed away soil is deposited in the river bottom making it shallower. The original dredged canal had a depth at normal river stage water level of 30 feet. It is presently only nine feet deep. Ascension Parish has not maintained the drainage canal anywhere near the original condition, nor within the confines of the servitude agreement despite it`s legally binding commitment with the Corps of Engineers to do so.
Regarding the request that the Commission pleads for:
A. That "the U.S. Corp. of Engineers address the issue of maintaining . . ."
In the servitude agreement that was entered into for the construction of the canal across our property, Ascension Parish, not the Corps of Engineers, agreed to be responsible for the ongoing maintenance of the canal. In the last 48 years, since the project`s completion in the late 1950s, Ascension Parish has done nothing to maintain the integrity of the canal anywhere close to its design when it was built. The natural silting in of the old Amite River bed, which has been allowed to happen in the absence of any maintenance, is the real reason why we are where we are today. If Ascension Parish had maintained the old Amite River bed, it could still be used by the public. But as to our canal, the servitude only covers enhancement of drainage, not public use and not navigation. . According to very specific, clear, and uncontestable Louisiana law, Servitudes are narrowly construed and restricted to the stated purpose for which they were created.
B. That the Corp of Engineers deny a permit that impedes the "The Amite River channel;" The permit being requested is a gate across a private CANAL — not the river. This is our private property and, because Ascension Parish has been unwilling to fulfill its responsibilities or assist us in controlling the use of the canal, we must enforce our property rights.
C. The APWC speaks of the Amite River as if the CANAL is part of the river. The canal never was, nor is it now a part of the river — it is still a canal across/on private property. This is true regardless of the fact that the old Amite River bed has been allowed to silt in due to lack of maintenance by Ascension Parish. They claim public servitude but the property in question is not a public servitude. It is a servitude that is for the sole purpose of drainage. It is not dedicated to public use, either directly or implicitly. Our acquiescence to public use is likewise not dispositive of the issue. See Arlen B. Cenac, Jr. v. PublicAccess Water Rights Association where the Louisiana Supreme Court held that a landowner`s toleration of and acquiescence in long and continuous public use of land, without more, is insufficient to establish a plain and positive intent to dedicate. The use, without the owner`s consent or permission, does not give anyone, private businesses or the public at large, the right to continued use after the owner finally makes an objection. By filing our permit request and numerous prior complaints on the local, parish and state levels, we are making our objection.
D. The Parish of Ascension request other governmental agencies join in to ignore the Louisiana Law and private property ownership rights to preserve what they erroneously call a "public servitude". The use of servitude is legally limited to that entity to which it was granted, to the exclusion of all other parties and purposes not mentioned. The public at large is not the grantee, nor was navigation stated as the purpose.
The Ascension Parish Waterways Commission claims that their intent is to protect the river, but their actions listed above proves that they do just the opposite. They aid and abet, protect and assist these private businesses and operators who are destroying the river because of the revenue that they get from helping them do just that.
REASONS FOR THE ENFORCEMENT OF OUR LEGAL LANDOWNERS RIGHTS:
The problems we face on a daily basis do not involve the recreational boats that occasionally cross our property. Instead, we are dealing with commercial wake boarding schools and clubs that run back and forth on the straight-of-way of our canal all day long. While they profit from this enterprise, we have to deal with these same boats going back and forth on the same short straight run of our canal and the Amite River, from daylight until (illegally) after sundown, passing the same spot, and washing the bank hundreds and hundreds of times a day. On Father`s Day 2005, there were six boats, going back and forth. We counted one boat that passed across our canal over sixty times in less than ninety minutes. These particular boats, take on water ballast in a strategically built-in water-ballast tank to add weight and displacement to the boat in order for it to intentionally and deliberately throw a huge wakes for the wake boarders to surf (seehttp://en.wikipedia.org/wiki/Wakeboardin g. scroll down to where it says Boat). Those huge destructive wakes impact the bank over and over every time the boat passes. The erosion of the bank is devastating. We have photos and video of the bank that show what is happening every time they pass. The dirt washes from the bank into the river as effectively as hydraulic mining where a powerful fire-hose-like stream of water is used to dislodge and convert an ore to slurry. They are rapidly destroying the river. It should be illegal to intentionally make huge wakes, on purpose, and constantly bombard confined shorelines with them but enforcement authorities do nothing. These are not recreational boats, they are professional ski boats whether private or business owned.
There is a legitimate, well-known ski school (Bennett`s Water Ski and Wake Boarding School in Zachary, Louisiana) that has its own lakes that it operates on. No problem — that is the proper way for this activity to be conducted — on privately owned or very large lakes, not on narrow public waterways with which the tax payers and private land owners will ultimately suffer the damages. These commercial wake boarder operators should be required to have their own lake or go to a large lake where the wave energy can have room to dissipate, instead of allowing them to destroy the natural waterways and private canals.
The boat operators and passengers often overload their boat with as many as twelve to fifteen riders, each waiting his or her turn on the wake board — one right after another all day long. They are rude and obnoxious, making obscene signs and gestures, playing loud obscene-lyrics music from powerful PA systems aboard their boats, and they stand and urinate into the river in full public view from the stern of their boats.
These boats are housed on their trailers in rented dry-boat-storage-stalls, and they are launched periodically at a for-pay boat launching ramp owned and operated by a member of the APWC. He has called accusing us of "harassing his customers" because we asked the boaters to pass on by and have fun down river at the lake.
One of the offending companies conducting this destruction operation calls themselves "RUKUS BOARD SPORTS" and some of their patrons have a web site, "Crooked Minds.com". Their choice of a company name and logos are an indication of their character and their intent to cause a RUCKUS — a noisy commotion, fracas, rumpus; a heated controversy. They intentionally try to be, in your face, as offensive and as obnoxious as they possibly can. They are being as rude as possible and making statements like go on off and go back into your house or why don`t you leave your property. They are in effect trying to make us so miserable in our own home as to run us off our property.
What we are trying to do by our action is to get some officials in positions of authority to take note of what is happening; to fulfill their responsibility for maintenance, and to somehow stop these commercial operators, operating for pay, from their wanton destruction of not only our property, but the rest of the river as well.
At the time of the agreement and construction of the canal, no easement or right-of-way provisions were made for our access to our north or island side property. Part of our property has been land and water locked for 50 years. That we were not granted access to our property from the Livingston Parish north side indicates that there was no intent to close the old river bed. We have no access to our north shore property, except by boat. How are we to economically get equipment, rip-rap or any other type of bulk head material to the island? How is it fair and equitable for us to spend the next five to ten years of our lives working to build a bulk head at a cost of $5 to 6 million, while the ski school or any other large wake boat continues destructive activity at our expense?
HISTORICAL EVENTS
There are numerous historical events that preceded the point of applying for the permit to install a gate on our property that you should be aware of. These events are why we see no other alternate solution to combat the destruction and illegal taking of our property through unjust enrichment.
We have approached the Ascension Parish authorities (Public Council Meetings, Councilman, and President) for the last several years with no relief or assistance. For example:
 1) We and the six adjacent landowners petition the Ascension Parish Council for a "no ski zone" to allow the boats go by and have fun down river or at the lake. They refused to take action, denied the petition, and passed the buck to the Department of Wildlife and Fisheries. The DWF denied involvement, stated that they only enforce the laws and all regulations are driven by Ascension Parish Council.
 2) We learned that Ascension Parish has a flood and drainage control project that will allow its tax paying residents to get on a list for broken concrete to control erosion in drainage canals and ditches. The parish has refused on two separate occasions to bring us any broken concrete, even when they have been shown the maps and "Assurance Document" that prove that this is a drainage canal. All we asked for was one or two loads a week or a month.
 3) We met with numerous attorneys who suggested we put up our own "no wake zone" because we have the right to say who and how someone crosses our property. We then met with the Ascension Parish Sheriff to ask for enforcement of a "no wake" zone and other existing laws as to the behavior on our canal but he refused.
 4) We tried to get a meeting with an Ascension Parish Judge, but denied and told that we must file a civil suit.
 5) We met with the Ascension Parish District Attorney, told him of our problem showed him our legal documents and he said if these documents are true, "then you first need a Hold Harmless Agreement from the parish because if someone gets hurt on this canal they could possibly file charges against you". He sent us to the Assistant District Attorney who reviewed our documents, acted as if he would help us get some relief and help. He dictated a letter to the Parish president, we told him we were not interested in pursuing this in court and that we wanted a "Hold Harmless Agreement" and then we would like to pursue a "No-Wake Zone". The parish has refused to do anything. Not a "Hold Harmless agreement, Not a "No-Wake Zone", and not even broken concrete. In fact, even after we shared our information in confidence with the Assistant District Attorney, he has shared it with the public and with the waterways commission and has had public meetings about our property with out our knowledge. Even more unjust is that he sent the Ascension Parish Waterway Commission Resolutions to you from his office using his title and letter head to make these personal recommendations look like they are officially from his office. He is using a public office position, being paid by tax payer`s dollars, to represent the Waterways Commissioner whose personal business will be affected by our gate.
 It is just a matter of time before someone gets hurt on our property due to the unsafe boating and unruly destructive boating practices. We have photos to document this behavior and have actually seen people get run over by their own boats on more than one occasion. The lack of enforcement for whatever reason, whether due to man power shortage in the Sheriff`s department or the bigger "bear" problems on the diversion canal, or just not being there during this unruly and lawless activity is not acceptable.
MAIN DRIVING FORCE BEHIND THE PERMIT APPLICATION SUBMITTAL
The heart of the problem is Ascension Parish`s failure and refusal to live up to its written and recorded responsibility to maintain the old Amite River bed and the canal across our property. Ascension Parish officials have turned a blind eye to the river and have ignored its problems since the day the flood water project was completed. The banks of the canal have been allowed to erode away private property that was never granted or conceded to the original drainage work. If this erosion were of the natural river itself, it could be considered an act of nature for which no one is responsible. But this is not the river; it is a man-made canal within defined banks for which Ascension Parish assumed maintenance responsibility. They are legally responsible, but have chosen to ignore and neglect that responsibility.
Ascension Parish officials now want the Federal and/or State Governments to appropriate and dedicate such funds or resources as to bail out Ascension Parish`s obligation, after the single most costly natural disaster in the United States and during a war against terrorism. Therefore from our view point it is highly unlikely that any agency will have the resources to address the land reclamation with sheet piling or rip-rap limestone material for which a permit has been issued by the Corp of Engineers. The obligated Ascension Parish Government has refused to help or even talk about helping or even issuing a Hold Harmless agreement that would only have paper, ink and very minor administrative cost. I have no confidence that our property will get any attention or receive construction funding for sheet piling when the levees in New Orleans are still under construction. But here are two a novel approaches, 1) get Ascension Parish to tax the Ski-school and Galveztown Landing to pay for the land reclamation project and reimburse us for all our expenses to date, or 2) take the money Ascension Parish is willing to spend on litigation and appropriate that money to make our property whole including "no wake zone" signage.
We have lost more than at least 150 feet total of shore line property along the canal that crosses our land. All of the soil washed from the banks has silted into the bottom of the canal and reduced its original depth from 30 feet to a present day nine feet. Even with this information presented to Ascension Parish, they still ignore the destruction of the river and their responsibility for the maintenance for which they are legally bound.
The loops of the old original river bed have been allowed to silt in, forcing river traffic to use the canal across our property which was never built for, or dedicated, to the purpose of navigation or public use. Nowhere does the right-of-way agreement state that these canals were for navigation, nor that they were intended as a replacement for the original natural river bed. They were for the express purpose of drainage ENHANCEMENT — not total drainage, but enhancement of drainage. A rope, cable, or chain "gate" or the highly visible, safe, flexible, floating whisperwave gate across the canal will not in any way impede drainage — the sole purpose and intent of the canal.
We will continue to provide all the flood stage reduction benefits to all the people who live within the Amite and Comite River basins, this includes most of Baton Rouge, Baker, Denham Springs, Central, etc. and all the towns north of us all the way to the Louisiana/Mississippi state line. We in no way stop flood waters or affect flood water stage.
The usage of our property for boating activity is illegal and each and every boat that passes without our consent is trespassing. This activity is resulting in the continued destruction and illegal taking of our property. Ascension Parish is in violation of the Right-of-Way Agreement and the "Assurance Document" and refuses to uphold the terms of those legal and binding documents with respect to the right-of-way canal constructed across our property by the Corp of Engineers. Maintenance is known as keeping the canal in a condition that approaches how it was when it was constructed. Ascension Parish has refused and has failed to live up to its end of the bargain.
We have requested the permit from the Corps of Engineers out of desperation. We have sought advice and assistance from all levels of state and local government. We have spent a lot of money and a lot of time. We have tried to come up with a compromise. But our efforts have been for naught. The Ascension Parish Council has refused to help. The Wildlife and Fisheries Department Has refused to help. The Sheriff has refused to help. The Parish President has refused to help. The Ascension Parish District Attorney`s Office has not only refused to help but has betrayed confidence. With no assistance from our local officials, we have had to resort to closing our canal from public traffic. In order to maintain our property, we have no other option. Hopefully the closing of the canal will compel Ascension Parish to step up to the plate and take its responsibility. If so, we are still willing to work with the appropriate officials. If not, then our property will be protected and Ascension Parish can explain to its citizens why the situation is as it is.
Curtis Sutherland
 cc: Newman Trowbridge, Jr. A Professional Law Corporation 600 Jefferson Street, Suite 501 Lafayette, LA 70501
 Kenneth E. Pickering Pickering Cotogno 301 Magazine Street New Orleans, LA 70130
 Assistant District Attorney Donna Logan Harris County District Attorney Office Second Floor 1201 Franklin Street, Houston, TX 77002
 Mr. Roger Swindler New Orleans District, Corp of Engineers P.O. Box 60267 New Orleans, LA 70160-0267
 Mr. Clay Carter Public Lands Utilization Manager State Land Office — Division of Administration 1201 North 3rd Street, Suite G-150 Baton Rouge, LA 70802
 Dr. Robert Gambrell, Chair School of the Coast and Environment Louisiana State University Baton Rouge, LA 70803
 Dr. Donald Adrian Civil and Environmental Engineering Louisiana State University Baton Rouge, LA 70803
 Mr. Dietmar Rietshier Amite River Basin, Executive Director 3535 South Sherwood Forest Blvd., Suite 135 Baton Rouge, LA 70816-2255
 Cypremort Point State Park, Louisiana Installed October, 2003 LA Department of Natural Resources